UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LTI FLEXIBLE PRODUCTS, INC., et al.,<br><br>Defendants. | Case No. 3:20-cv-08686-WHO<br><br>**ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 110, 115, 116 |

Plaintiffs Regents of the University of California ("the Regents") and TiMEMS, Inc. ("TiMEMS") allege that defendant LTI Flexible Products, Inc. dba Boyd ("Boyd") has infringed several of its patents. Boyd moves for summary judgment on one of those infringement claims. According to it, the plaintiffs do not solely own the patent. The evidence substantiates that argument. One of the named inventors of the patent assigned his rights to another entity (since purchased by Boyd) in 2012. Because the plaintiffs must join all co-owners in an infringement suit and cannot show that they are the sole owners, summary judgment is appropriate.

## BACKGROUND

### I. FACTUAL BACKGROUND

The Regents administer the University of California system, including the University of California, Santa Barbara ("UCSB"). TiMEMS is a research and development company associated with the Regents. From 2006 to 2010, Payam Bozorgi was a Ph.D. candidate at UCSB, studying micro electromechanical systems ("MEMS") and titanium thermal ground planes ("Ti-TGPs"). *See* Third Amended Complaint ("TAC") [Dkt. No. 86] ¶ 15. He worked under Professor Carl Meinhart. *Id.*

Bozorgi and Meinhart are the named inventors on U.S. Provisional Patent Application No. 62/106,556 ("the '556 provisional"), filed in January 2015. U.S. Patent No. 10,458,719 ("the '719 patent") and U.S. Patent Application No. 15/000,460 ("the 460 application") claim priority to it. The '556 provisional, '719 patent, and '460 application are, collectively, referred to as "the Subject IP."

I have recounted some of the history of ownership of the Subject IP in prior orders. This order only concerns the chain of title that arose from Meinhart's interest in the Subject IP, so I do not discuss the chain of title that arose from Bozorgi's interest. In 1996, Meinhart agreed to a "patent acknowledgement agreement" with the University that committed him to assign inventions to it that were "conceive[d] or develop[ed] while employed by the University or during the course of [their] utilization of any University research facilities, or any connection with my use of gift, grant, or contract research funds received through the University." *See* Dkt. No. 116-3 ("1996 Agreement"). In February 2013, he agreed to an amendment that actually made that assignment. *See* Dkt. No. 116-5 ("2013 Agreement").

In between the 1996 acknowledgement and the 2013 assignment, Meinhart also executed another agreement that is the subject of this motion. That agreement was between Meinhart and PiMEMS, Inc., a company that he and Bozorgi founded in August 2012. *See* Dkt. No. 116-23, Ex. 1.a ("2012 Assignment"). It states that "all right, title, and interest in and to any copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets" that are "conceived, discovered, authored, invented, developed or reduced to practice by [Meinhart] solely or in collaboration with others, while [Meinhart] is providing services to [PiMEMS]" and any "patents . . . or other intellectual property rights related to" those categories will be the "sole property of [PiMEMS]." *Id.* ¶ 2(a). And it states that Meinhart "irrevocably assigns . . . all right, title and interest" in them to PiMEMS. *Id.*

In 2019, Boyd and PiMEMS's shareholders entered into a stock purchase agreement (the "SPA"). *See* Dkt. No. 115-4 ("SPA"). Pursuant to that agreement, all PiMEMS stockholders sold their shares to Boyd. *Id.* § 1.01. The SPA provided that PiMEMS retained all rights in certain pieces of intellectual property. *Id.* §§ 3.17(b), (c). The Regents were among the PiMEMS

1  shareholders to agree to the SPA. *Id.* § 3.03. The SPA provided that PiMEMS's use of the
2  intellectual property at issue "does not . . . infringe . . . any of the UCSB Property Rights" to
3  PiMEMS's knowledge. *Id.* § 3.17(b).

**II.    PROCEDURAL BACKGROUND**

The plaintiffs filed suit in December 2020 and amended their complaint in February 2021. Dkt. Nos. 1, 26. In May 2021, I granted Boyd's partial motion to dismiss. Dkt. No. 45. As relevant here, I found that the plaintiffs had not shown they possessed standing to pursue their claim for infringement of the '719 patent because the evidence indicated they were not the sole owners of the patent. *Id.* 5–8. And I found that their claim for declaratory judgment that they owned the '556 provisional was barred by the statute of limitations. *Id.* 8–11. In response to a motion to dismiss the amended complaint, I found that the plaintiffs had adequately alleged that they solely owned the '719 patent, but permitted Boyd to bring a stand-alone summary judgment motion on that issue so that both parties could develop and present an evidentiary record. Dkt. No. 81. I dismissed the claim for declaratory judgment of the '556 provisional as time-barred with leave to amend. *Id.* Finally, in response to the amended complaint, I dismissed the claim for declaratory judgment about the '556 provisional only to the extent that it was predicated on Meinhart's chain of title. Dkt. No. 99.

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

1   On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I.    SUMMARY JUDGMENT**

Boyd moves for summary judgment on the claim of infringement of the '719 patent. As a general matter, Boyd contends that the plaintiffs do not have sole ownership of the Subject IP. *See generally* Motion for Partial Summary Judgment ("Mot.") [Dkt. No. 116]. Because I find that summary judgment is warranted on the ground discussed below, there is no need to address Boyd's alternative argument.

The Federal Circuit has "long applied the rule that a patent co-owner seeking to maintain an infringement suit must join all other" co-owners. *STC.UNM v. Intel Corp.*, 754 F.3d 940, 944 (Fed. Cir. 2014). Consequently (absent two exceptions not relevant here), "as a matter of substantive patent law, all co-owners must ordinarily consent to join as plaintiffs in an infringement suit." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998). "Ordinarily, one co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit." *Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 345 (Fed. Cir. 1997). And (generally) if a party is a co-owner of a patent, it necessarily cannot infringe that patent. *Id.* at 344.

"The question of who owns the patent rights and on what terms typically is a question exclusively for state [law]." *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841 (Fed. Cir. 2009) (internal quotation marks, alteration, and citation omitted). But "the question of whether a patent *assignment* clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases." *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed.

4

Cir. 2008) (emphasis added, citations omitted). The Federal Circuit has "accordingly treated it as a matter of federal law." *Id.*; *see also Stanford*, 583 F.3d at 841.

Boyd argues that it co-owns (or "at least" co-owns) the Subject IP. Boyd's argument depends on the 2012 assignment to PiMEMS. To repeat, that assignment was executed by Meinhart and became effective August 29, 2012. *See* 2012 Assignment. It states that "all right, title, and interest in and to any copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets" that are "conceived, discovered, authored, invented, developed or reduced to practice by [Meinhart] solely or in collaboration with others, while [Meinhart] is providing services to [PiMEMS]" and any "patents . . . or other intellectual property rights related to" those categories will be the "sole property of [PiMEMS]." *Id.* ¶ 2(a). For the reasons that follow, I conclude that Boyd is entitled to summary judgment that the plaintiffs are not the sole owners of the Subject IP.

**A. The 2012 Agreement is Valid**

The plaintiffs challenge the 2012 assignment's validity on only one ground: They argue that it was not supported by consideration. I disagree.

Under California law, a contract requires (1) parties capable of contracting, (2) their consent, (3) a lawful object, and (4) consideration. Cal. Civ. Code § 1550. Consideration is "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor." Cal. Civ. Code § 1605. "Consideration is present when the promisee confers a benefit or suffers a prejudice." *Prop. California SCJLW One Corp. v. Leamy*, 25 Cal. App. 5th 1155, 1165 (2018). But that benefit or prejudice must "actually be bargained for as the exchange for the promise." *Id.* (internal quotation marks and citation omitted). Said otherwise, "the benefit or prejudice must have induced the promisor's promise." *Steiner v. Thexton*, 48 Cal. 4th 411, 421 (2010).

The 2012 assignment was supported by consideration. As Meinhart admitted in litigating this summary-judgment dispute, he and Bozorgi co-founded PiMEMS. *See* Dkt. No. 122-1 ¶ 27.

5

The plaintiffs have submitted an email from Meinhart to a University employee from September 2016. In it, Meinhart stated that he "received PiMEMS stock when the company was founded" and that he executed the 2012 assignment "when the company was founded." Dkt. No. 122-4. The assignment itself contemplates that Meinhart would be a "service provider" for PiMEMS. *See* 2012 Assignment at 1. It contemplates that he will "perform[] . . . services on behalf of" PiMEMS. *Id.* ¶ 1(b). It contains a web of provisions governing the relationship between Meinhart and PiMEMS. It then assigns certain intellectual property rights to PiMEMS related to Meinhart's provision of service. *Id.* ¶ 2.

There is only one reasonable understanding of these events and this agreement: the assignment of IP rights was part of the parties' bargained-for agreement. To start, the 2012 assignment itself states that it is made in "consideration of the mutual promises contained herein," and the assignment is contemplated as part of the service provider arrangement described "[there]in." As a general principle of California contract law, "courts should not inquire into the adequacy of consideration." *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 679 (1988). And, under California law, "[a] written instrument is presumptive evidence of a consideration." Cal. Civ. Code § 1614. While that does not mean that every written instrument is conclusive on this point, *see, e.g.*, *Jara v. Suprema Meats, Inc.*, 121 Cal. App. 4th 1238, 1249 (2004), Meinhart's demonstrated intent to be contractually bound—evidenced in a written instrument that recited it was made for consideration—goes a long way to defeating the plaintiffs' argument. After all, the function of consideration is largely "evidentiary," *Pugh v. See's Candies, Inc.*, 203 Cal. App. 3d 743, 751 (1988), meant to ensure that the parties truly intended to be bound rather than one making a mere gratuitous promise. *See, e.g.*, *Jara*, 121 Cal. App. 4th at 1249. Here, there was a clear bargained-for exchange that included the assignment of intellectual property.

This aside, in context there is only one reasonable understanding of this exchange: As part of his service provider and co-founder relationship with PiMEMS, Meinhart agreed to assign away certain rights to what would otherwise be his intellectual property. A closely related situation—an assignment of intellectual property by an employee as part and parcel of an employment agreement—is relatively standard. *See, e.g.*, *Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1284

(Fed. Cir. 2012). Meinhart's assignment was no mere gratuity; it was part and parcel of the formation of his company. And Meinhart received benefits in return: the company he co-founded, received stock in, and for which he agreed to be a service provider could be sure that it would own the intellectual property developed by service providers in the course of their relationship. To help see why consideration is present here, consider a counterfactual in which the plaintiffs were correct and this agreement was not supported by consideration. In that hypothetical, Meinhart would have co-founded a company, received stock in it, signed up as a service provider, and—unconnected to all of that but at the same time—happened to assign away IP that he developed at that company in exchange for nothing. And he would be able to, a decade later, disaffirm his explicit agreement to the contrary that multiple companies and their shareholders reasonably relied on. That is not a reasonable understanding of these undisputed facts.[1]

To resist this finding, the plaintiffs first appear to argue that the contract needed to expressly say what the bargained-for consideration was. *See* Opposition to the Mot. ("Oppo.") [Dkt. No. 122] 13–14. That would have been ideal, but its absence does not invalidate the contract or show it was made without consideration. *Cf.* 1 Witkin, Summary of California Law 11th Contracts § 207 (discussing recitals of consideration and explaining that they are only prima facie evidence of consideration). In a related context—a contract that assigned patent rights in exchange for employment—the California Court of Appeal rejected a party's argument that the assignment failed for lack of consideration. *Cubic Corp. v. Marty*, 185 Cal. App. 3d 438, 448 (1986). The party argued that the employment could not have been the consideration because he

---

[1] In its reply brief, Boyd argued that Meinhart receiving stock was part of the consideration. *See* Dkt. No. 124. At the hearing, for the first time, the plaintiffs replied that he had received a separate payment for that stock but that they did not have the opportunity to introduce that evidence because the stock argument was raised in a reply brief. It was appropriate for Boyd to challenge the plaintiffs' argument about lack of consideration in the reply as they did because the opposition raised the issue of lack of consideration as a ground for denial of summary judgment. It was also *the plaintiffs* who introduced evidence of the stock transfer with their opposition. *See* Dkt. No. 122-4. And they also did not seek leave to file a supplemental brief if they believed it necessary before unveiling the evidence at the hearing. But more fundamentally, crediting the plaintiffs' new purported evidence would not change the analysis. My decision about consideration is not based on a quid pro quo of stock-for-assignment of rights. Instead, I find that there was consideration based on the totality of Meinhart and PiMEMS's agreement and course of dealings. Even if he also received a payment for the stock, his assignment was supported by consideration.

1  signed the agreement only after he was hired—that is, it was not explicitly bargained-for. *Id.* The
2  court disagreed, explaining that the circumstances of the execution—there, that the employee was
3  given the agreement to sign at his orientation—showed that it was a condition of employment. *Id.*
4  The same fundamental principle applies here too. And these holdings are consonant with broader
5  California contract-law principles, which instruct courts to look to the totality of the circumstances
6  of the parties' relationship to determine whether a contract was validly formed. *See, e.g.*, *Banner*
7  *Ent., Inc. v. Superior Ct. (Alchemy Filmworks, Inc.)*, 62 Cal. App. 4th 348, 358 (1998), *as*
8  *modified* (Mar. 30, 1998).

9  None of the plaintiffs' authorities compel a different conclusion. One group of their cases
10 is just about contracts that failed for lack of mutuality or because the consideration was illusory—
11 that is, one party had discretion to not assume a detriment or give a benefit. *Shortell v. Evans-*
12 *Ferguson Corp.*, 98 Cal. App. 650, 660 (1929); *Hamlin v. Barnhart*, 26 Cal. App. 632, 634
13 (1915); *see also* Restatement (Second) of Contracts §§ 77, 81 (discussing illusory promises and
14 mutuality). Neither case held nor implied that a contract failed for lack of consideration simply
15 because it did not *expressly* lay out what the consideration was if it is otherwise plain from
16 surrounding circumstances. And, incidentally, this strict approach to "mutuality" is now outdated
17 anyway. *See Foley*, 47 Cal. 3d at 672 n.14 ("If the requirement of consideration is met, there is no
18 additional requirement of . . . 'mutuality of obligation.'" (internal quotation marks omitted) (citing
19 Restatement (Second) of Contracts § 81)).

20 The plaintiffs' other authorities just state variants of the basic interpretive principle that
21 contractual meaning is generally determined from the text alone when appropriate. *See, e.g.*, Cal.
22 Civ. Code § 1638. To start, this is not an issue of contract *interpretation*, it is an issue of
23 *formation*. That inquiry focuses on the parties' objective manifestations of intent. *Banner*, 62 Cal.
24 App. 4th at 358. In any event, the contract here *does* state it was for consideration. Even if the
25 plaintiffs were correct that these principles applied, examination of the surrounding circumstances
26 would be appropriate. *See, e.g.*, *Gilkyson v. Disney Enterprises, Inc.*, 66 Cal. App. 5th 900, 916
27 (2021) ("*When the contract is clear and explicit*, the parties' intent is determined solely by
28 reference to the language of the agreement." (emphasis added)); Witkin, Contracts § 207 (stating

8

1   that recitals of consideration are prima facie evidence and that "true consideration" may be shown
2   by factual, extrinsic evidence).

3   The plaintiffs also argue that Meinhart was never *employed* by PiMEMS. Oppo. 15–18.
4   That would not alter the analysis. If the agreement had expressly been one of employment, it too
5   might have made the validity of consideration clear. *See, e.g.*, *Cubic*, 185 Cal. App. 3d at 448.
6   But that Meinhart was a co-founder, stockholder, and service provider rather than employee does
7   not erase the consideration that was present. Relatedly, the plaintiffs argue that Meinhart was
8   never *paid* to be a service provider. Oppo. 16. But he inarguably committed to being one in a
9   written instrument and, for the reasons explained, the deal he did strike was sufficient.

## B. The 2012 Agreement Applies to the Rights at Issue

Because the 2012 assignment is valid, I turn to whether it covered the rights at issue.

### i. Scope of the Agreement

The 2012 assignment covers intellectual property that was "conceived, discovered, authored, invented, developed or reduced to practice by [Meinhart] solely or in collaboration with others, while [Meinhart] is providing services to [PiMEMS]." 2012 Assignment ¶ 2(a). Boyd has introduced sufficient evidence from which a reasonable jury could find that the Subject IP here falls into this definition. In particular, Meinhart told the plaintiffs this when submitting the request for title clearance about the '556 provisional (from which the other Subject IP components claim priority). Dkt. No. 116-7. He wrote that the technology was "developed exclusively at PiMEMS . . . using exclusively PiMEMS' resources." *Id.* Bozorgi likewise made that guarantee to the University in that request. *See id.*

The question becomes whether the plaintiffs have shown a genuine dispute of material fact that precludes summary judgment. To do so, the plaintiffs argue that some university resources *were* used, making the statement that the technology was *exclusively* developed at PiMEMS false. *See* Oppo. 10–12. And they repeatedly argue that the patents were not "solely" made using PiMEMS technology. *Id*. 4, 10. But even if that is true, it would not alter my finding. The 2012 agreement Meinhart signed does not require that the technology be developed cradle-to-grave at PiMEMS. Instead, it provides that Meinhart would assign *his* right, title, and interest in IP that

9

was "conceived, discovered, authored, invented, developed or reduced to practice by [Meinhart], solely or in collaboration with others, while [Meinhart] is providing services to [PiMEMS]" and any "patents . . . or other intellectual property rights related to" those categories. 2012 Assignment ¶ 2(a). All that the plaintiffs point to that was done outside of this relationship was that *Bozorgi* used a UCSB laser welder when developing *his* contribution to the technology. *See* Oppo. 12 (citing exhibits). But Meinhart's work, even on the plaintiffs' account, was "making modifications and refinements to a design that he originally conceived in June 2014, and determining suitable values for certain parameters of the inventive Ti-TGPs, including Ti-TGP dimensions, intermediate layer configuration(s), wick depth, and the spacing and pitch of the microstructures in the vapor chamber." *Id.* 4. The only proffered connection to UCSB facilities is that Meinhart "evaluated" the test results from Bozorgi's earlier work. *Id*. The present dispute, however, is not about Bozorgi's interest; it is about Meinhart's. This evidence creates no genuine dispute of material fact about whether Meinhart "conceived, discovered, authored, invented, developed or reduced to practice" the technology while he was "providing services to" PiMEMS, which is what his assignment covered. 2012 Assignment ¶ 2(a).[2]

### ii. Relationship to Other Agreements

At various points, the plaintiffs reference that Meinhart signed other contracts relating to these intellectual property rights before and after he signed the 2012 assignment. They do not outright suggest that these contracts invalidate the 2012 assignment or mean that Meinhart had no rights to assign. But to the extent they could be taken to make that suggestion, I reject it.

I begin with the agreement signed before the 2012 assignment. I have previously held in this case that the 2011 agreement was, under well-established Federal Circuit precedent, not an assignment of the rights but a mere promise to assign. *See* Dkt. No. 45 at 6–7. It states that Meinhart was obligated to assign his rights in certain inventions to the University, not that he did

---

[2] The 2012 assignment includes a provision that addresses "pre-existing materials," but no party argues that is has any bearing on this dispute. The plaintiffs also repeatedly argue that Meinhart made this assignment only because he was lied to about the facilities used in Bozorgi's research. That does not change the fact that the assignment *was* made and the plaintiffs advance no theory to invalidate it on that basis.

assign those rights. *See id.*; Dkt. Nos. 42-1 at 5, 42-2 at 4. Under the law, that language is insufficient to assign away rights. *See DDB Techs.*, 517 F.3d at 1290; *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1581 (Fed. Cir. 1991). Accordingly, Meinhart still possessed all rights at issue when he executed the 2012 assignment.

I turn to the agreements signed after the 2012 assignment. Meinhart executed an amendment to that earlier contract in February 2013 that, as I have previously held, would be an automatic assignment of rights rather than a promise to assign in the future. *See* Dkt. No. 81 at 8–9 (citing *DDB Techs.*, 517 F.3d at 1290; *Speedplay*, 211 F.3d at 1253). I found that the allegations that this agreement covered the rights at issue were sufficient to make it past the pleadings stage and would need to be resolved via an evidentiary determination. *Id.* at 9. Now, however, it is clear that the 2012 assignment covered the rights at issue and assigned them to PiMEMS. So when Meinhart executed the 2013 agreement, he lacked any rights to assign to the University. *See, e.g.*, *Stanford*, 583 F.3d at 842 (holding that, after a valid assignment of patent rights is made, "legal title to the rights accruing thereunder would be in the assignee and the assignor-inventor would have nothing remaining to assign" (internal quotation marks, alteration, and citation omitted)). Meinhart also signed another such agreement six days before the plaintiffs filed this suit, but it does not change the analysis for the same reasons. *See* Dkt. No. 116-10.

The plaintiffs also attempt to show that *Bozorgi* assigned his rights to them. Oppo. 9. But the present question is just whether Meinhart assigned his rights to PiMEMS in 2012 or not, a determination unaffected by Bozorgi's chain of title.

Finally, I note that the plaintiffs have advanced no argument in their brief that an otherwise valid transfer of rights should be invalidated. Indeed, they represent that they "no longer need[] a declaratory judgment" to alter current ownership. Oppo. 13. (I also previously dismissed the declaratory judgment claim as time-barred to the extent it was predicated on Meinhart's interest. *See* Dkt. No. 99.)

### C. The Agreement Assigned the Rights at Issue to PiMEMS

The 2012 assignment is also sufficient to automatically assign all of the rights it covered to PiMEMS under settled Federal Circuit law: It states that the rights, title, and interest are assigned

11

by operation of the contract (rather than making a mere promise to assign in the future). *See DDB Techs.*, 517 F.3d at 1290 ("If the contract expressly grants rights in future inventions, no further act is required once an invention comes into being, and the transfer of title occurs by operation of law. Contracts that merely obligate the inventor to grant rights in the future, by contrast, may vest the promisee with equitable rights in those inventions once made, but do not by themselves vest legal title to patents on the inventions in the promisee." (internal quotation marks, citations, and alterations omitted)); *see, e.g., id.* (finding language that a promisor "does hereby assign" rights to be an automatic assignment); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) (finding an automatic assignment because the contract "provide[d] that inventions 'shall belong' to" the promise and the promisor "hereby conveys, transfers and assigns" the inventions); *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1570, 1573 (Fed. Cir. 1991) (finding an automatic assignment because the contract stated that the promisor "agrees to grant and does hereby grant" the rights).

### D. The Regents Are Not Sole Owners

There is no dispute that Boyd acquired PiMEMS and all of its property in a sale. *See generally* SPA. The plaintiffs have pleaded that Boyd "acquired PiMEMS" and that the acquisition was "a consolidation or merger" such that PiMEMS "no longer exists as a separate legal entity." TAC ¶¶ 101–03. So if, as I have found, PiMEMS possessed Meinhart's rights at that point, those rights transferred to Boyd. Boyd cannot infringe a patent it co-owns. At the very least, the plaintiffs have not joined all co-owners, precluding an infringement suit. *STC.UNM*, 754 F.3d at 944; *Ethicon*, 135 F.3d at 1468.[3]

## II. MOTION TO SEAL

Boyd moves to seal and redact information related to this dispute. Dkt. No. 115. Its motion is DENIED. Boyd is ORDERED to file public, unredacted copies of the documents it

---

[3] At one point, the plaintiffs appear to suggest that the rights did not transfer—though they do not fully say so and make no developed argument about it. *See* Oppo. 6. There is no evidence otherwise. But, importantly, even if the rights did not transfer from PiMEMS to Boyd, there is no reason (or evidence) they then would have gone *to the Regents*—which would be the only way they could be the owners of Meinhart's rights. Accordingly, if the rights never transferred to Boyd but instead stayed somewhere else, the plaintiffs would still not be the sole owners.

seeks to seal at Dkt. No. 115 within 14 days.

Courts "start with a strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). The public possesses a right to inspect public records, including judicial records. *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016). If a party seeks to seal judicial records connected to motions—such as the one at issue here—that are "more than tangentially related to the underlying cause of action," it "must demonstrate that there are 'compelling reasons' to do so." *Id.* at 1096–99. "When ruling on a motion to seal court records, the district court must balance the competing interests of the public and the party seeking to seal judicial records." *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012). This district's rules require that requests to seal be "narrowly tailored to seek sealing only of sealable material." Civ. L. R. 79-5(c)(3).

Here, Boyd offers no articulated reasons—let alone "compelling" ones—for sealing the information at issue. Neither the motion nor the supporting declaration includes any rationale other than that the information has been designated confidential under the protective order governing this case and conclusory assertions that they contain confidential information. *See* Dkt. Nos. 115, 115-2. But, as the Local Rules explain, "[r]eference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable." Civ. L. R. 79-5(c). Instead, Boyd was required to provide "a compelling reason and articulate the factual basis" for sealing. *Ctr. for Auto Safety*, 809 F.3d at 1096 (internal quotation marks, citation, and alteration omitted). That standard is "stringent." *Id.* Courts frequently deny motions to seal even when (unlike here) parties provide a concrete explanation of potential harm and reasons for confidentiality if they are not sufficiently compelling. *See, e.g.*, *Maldonado v. Apple, Inc.*, No. 3:16-CV-04067-WHO, 2021 WL 134579, at *5 (N.D. Cal. Jan. 14, 2021) (denying motion to seal corporate information described as "highly confidential" with supporting, specific documentation of confidentiality measures and threats of competitive harm). Boyd has not come close to meeting that burden.

## CONCLUSION

Boyd's motion for partial summary judgment is GRANTED.

A Case Management Conference is set for June 14, 2022, at 2 p.m. The parties shall propose a pretrial and trial schedule, or competing schedules, in their Joint Case Management Conference Statement that shall be filed on or before June 7, 2022.

**IT IS SO ORDERED.**

Dated: May 18, 2022



William H. Orrick
United States District Judge